IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LYNN OVERTON,<br><br>PLAINTIFF,<br><br>v.<br><br>EXELON CORPORATION<br><br>and<br><br>PECO ENERGY COMPANY,<br><br>DEFENDANTS. | Civil Action No. _____<br><br>JURY TRIAL DEMANDED |

**COMPLAINT AND JURY DEMAND**

Plaintiff Lynn Overton, by and through her attorneys, Bell & Bell LLP, hereby files the following Complaint and Jury Demand ("Complaint").

**PRELIMINARY STATEMENT**

1. This is an action for an award of damages and other relief on behalf of Plaintiff Lynn Overton (hereinafter "Plaintiff" or "Ms. Overton"), a former employee of Exelon Corporation and PECO Energy Company (hereinafter, collectively, "Defendants" or the "Company"). Despite her loyalty and consistent performance, Ms. Overton was subjected to discrimination and harassment on the basis of her disability and/or perceived disability, was denied reasonable accommodations, was retaliated against for seeking accommodations, was retaliated againt for seeking workers' compensation benefits and/or reporting a workplace injury, and was terminated as a result of such discrimination and retaliation.

2. This action arises under the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA") and the common law of the Commonwealth of Pennsylvania.

## JURISDICTIONAL STATEMENT

3. This Court has original jurisdiction over all civil actions arising under the Constitution, laws or treaties of the United States pursuant to 29 U.S.C. §§ 1331 and 1391.

4. The jurisdiction of this Court is also invoked pursuant to 28 U.S.C. § 1343(4), which grants the District Court original jurisdiction in any civil action authorized by law to be commenced by any person to recover damages to secure equitable or other relief under any act of Congress providing for the protection of civil rights.

5. This Court has supplemental jurisdiction over any Pennsylvania state law claims pursuant to 28 U.S.C. § 1367.

6. All conditions precedent to the institution of this suit have been fulfilled. On July 9, 2021, Plaintiff timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), which was dual-filed as a Complaint with the Pennsylvania Human Relations Commission ("PHRC"). On August 4, 2021, the EEOC issued a Notice of Right to Sue to Plaintiff. This action has been filed within ninety (90) days of Plaintiff's receipt of said Notice.[1]

## VENUE

7. This action properly lies in the Eastern District of Pennsylvania, pursuant to 28 U.S.C. § 1391(b).

---

[1] It has been less than one year since Ms. Overton dual-filed her Charge of Discrimination as a Complaint with the Pennsylvania Human Relations Commission for Defendant's violations of the Pennsylvania Human Relations Act, 43 P.S. § 951, et seq. ("PHRA"). Ms. Overton will seek to amend her Complaint in this matter to add her PHRA claims once she has exhausted her administrative remedy with respect to those claims.

8. This action properly lies in the Eastern District of Pennsylvania because significant activities associated with the claims alleged took place in this jurisdiction and because Plaintiff was employed by Defendants in this jurisdiction.

**PARTIES**

9. Plaintiff Lynn Overton is an adult female citizen and resident of Blackwood, New Jersey and the United States of America.

10. Ms. Overton is a qualified individual with a disability within the meaning of the ADA.

11. Ms. Overton's disability affects a major bodily function and substantially limits one or more major life activities.

12. Ms. Overton's disability has affected her for a period far in excess of six months.

13. Defendant Exelon Corporation is an energy provider incorporated in Pennsylvania and headquartered in Chicago, Illinois with a corporate address at 10 S. Dearborn St., 48th Floor, Chicago, Illinois 60603.

14. Defendant PECO Energy Corporation, a subsidiary of Defendant Exelon Corporation, is a provider of electric and gas in southeastern Pennsylvania and is headquartered in Philadelphia, Pennsylvania with a location at 2301 Market Street, Philadelphia, Pennsylvania 19103, where Plaintiff was employed.

15. At all relevant times, Defendants are and have been employers employing more than 500 employees.

16. At all relevant times, employees of Defendants acted as agents and servants for Defendants.

17. At all relevant times, employees of Defendants were acting within the scope of their authority and in the course of their employment under the direct control of Defendants.

18. At all times material hereto, Defendants acted by and through their authorized agents, servants, workmen and/or employees acting within the course and scope of their employment with Defendants and in furtherance of Defendants' business.

19. At all relevant times hereto, Plaintiff Lynn Overton was an "employee" of Defendants within the meanings of the laws at issue in this suit and is accordingly entitled to the protection of said laws.

20. At all relevant times hereto, Defendants were "employers" and/or "persons" under the laws at issue in this matter and are accordingly subject to the provisions of said laws.

21. During her employment, Defendants regarded Ms. Overton as disabled.

22. This Honorable Court has personal jurisdiction over the Defendants.

## FACTS

23. In or about October 2017, Ms. Overton began her employment as a Customer Service Representative for Defendants.

24. During her employment, Ms. Overton performed her duties in an excellent manner.

25. Despite her dedication and consistent performance, Ms. Overton was discriminated against and harassed on the basis of her disability and/or perceived disability, was denied reasonable accommodations, was retaliated against for seeking accommodations, was retaliated againt for seeking workers' compensation benefits and/or reporting a workplace injury, and was terminated as a result of such discrimination and retaliation.

26.     On July 30, 2019, Ms. Overton fell on PECO property and was severely injured, requiring multiple surgeries to treat, among other things, a serious knee injury.

27.     Ms. Overton was also diagnosed with cervical and lumbar disk herniations.

28.     Due to the fall, and the resulting injuries, Ms. Overton suffered and has continued to suffer from ongoing knee, back, and neck pain.

29.     Soon after the fall, Ms. Overton was granted Long Term Disability ("LTD") and sought treatment for her injuries, including therapy and pain management.

30.     On January 19, 2021, Ms. Overton received a letter from Defendants stating that Ms. Overton would be removed from the payroll and terminated if she could not return to work upon the end of the 12-month period starting on date of LTD.

31.     The letter further stated that Defendants offer reasonable job modifications or adjustments to employees who are able to work with restrictions and included a Request for Modifications or Adjustments Form ("Request for Modifications Form") for completion with any requested job modifications.

32.     The letter instructed Ms. Overton to contact the Company by January 29, 2021 or her employment would be terminated.

33.     Although the letter was dated October 28, 2020, Ms. Overton did not receive the letter until January 19, 2021.[2]

34.      After Ms. Overton received the letter, she promptly sought to provide the Company with the requested information.

---

[2] The letter was dated October 28, 2020.  The letter was not postmarked until December 8, 2020 from the company's location in Chicago, IL.  The letter was not postmarked by the New Jersey post office until January 14, 2021.  Ms. Overton ultimately received the letter on January 19, 2021.

35. Dr. Frederick, Ms. Overton's orthopedic surgeon, updated Ms. Overton's work status to modified duty, approving a four (4) hour workday.

36. Dr. Jeremy Simon, Ms. Overton's pain management physician, completed a Work Compensation Quick Note that detailed Ms. Overton's job modifications, including that she work on modified duty with the following restrictions: no repetitive movement, bending, stooping, kneeling, squatting, or climbing; that she not lift, push, or pull more than ten (10) pounds; and that she change positions every 20-30 minutes.

37. Ms. Overton completed the Request for Modifications Form with the restrictions outlined by her physicians.

38. On January 20, 2021, the day after she received the letter, Ms. Overton sent Colleen Burt, Human Resources Manager, an email summarizing the requested job modifications and attaching the Request for Modifications Form, Work Compensation Quick Note, as well as documentation explaining the late receipt of the letter.

39. That same day, Ms. Burt responded to Ms. Overton instructing her to call Laura Rippert from Occupational Health Services ("OHS") who could explain the return to work process for employees on LTD.

40. Per Ms. Burt's instruction, Ms. Overton called Ms. Rippert to obtain her email address so that she could send her the doctors' notes.

41. On January 21, 2021, Ms. Overton called Ms. Rippert to discuss her case and to confirm that Ms. Burt reached out to Ms. Rippert to begin processing Ms. Overton's return to work.

42. Ms. Overton apologized for the late response to the letter and told Ms. Rippert that she would never have waited so long to reach out but that she hadn't received the letter until January 19.

43. Ms. Rippert replied, "I know you wouldn't have."

44. Ms. Rippert advised Ms. Overton that she needed to get all of her doctor's notes and that Ms. Rippert would be sending a job description to Ms. Overton's doctors so that they could sign off on it.

45. Ms. Rippert also informed Ms. Overton that she needed to get written verification from Ms. Overton's physicians affirming that two of the medications Ms. Overton was taking at the time could not be taken during the course of business.

46. Ms. Overton and Ms. Rippert also reviewed the modifications that Ms. Overton had requested.

47. Ms. Rippert told Ms. Overton that the modification of 4 hours per day was unacceptable and had to have a defined end date.

48. Ms. Overton let Ms. Rippert know that she would have the doctor update the accommodation, which was subsequently revised to four hours per day for a period of two weeks.

49. Ms. Rippert said that the accommodation, as revised to four hours a day for two weeks, "would work."

50. Ms. Overton and Ms. Rippert also spoke about Ms. Overton's surgery schedule.

51. Ms. Overton notified Ms. Rippert that she had an MRI scheduled for January 26, 2021 and a follow-up appointment with Dr. Frederick on January 27, 2021.

52. Ms. Overton further told Ms. Rippert that she had several scheduled surgeries, but that they were delayed due to the coronavirus and asked if that would impact her case.

53. Ms. Rippert responded that she had seen in Ms. Overton's records that her surgeries were delayed, but that LTD had already started paying her.

54. Ms. Overton also expressed to Ms. Rippert that she was worried about her job status.

55. Ms. Rippert told Ms. Overton not to worry and that the department and Human Resources would hold Ms. Overton's job as she was in communication with the Company and following up.

56. On January 22, 2021, Ms. Overton emailed Ms. Rippert to ask if she had sent Ms. Overton's job description to her doctors' offices for approval.

57. Ms. Overton also provided the direct fax number for each office and let Ms. Rippert know that her doctors were anticipating receiving the description.

58. On January 25, 2021, Ms. Overton emailed Ms. Rippert again and provided her with doctors' notes completed by Dr. Frederick and Dr. Simon.

59. On January 26, 2021, Ms. Overton called Ms. Rippert to discuss the email Ms. Overton had sent the day prior with the doctors' notes, but she was unable to reach Ms. Rippert.

60. Ms. Rippert called Ms. Overton back a few hours later, at approximately 2:17 p.m., and stated that she had received the sign-off from Dr. Fredrick but that he hadn't documented that the medications should not be taken during working hours.

61. Ms. Overton told Ms. Rippert that Dr. Fredrick didn't prescribe the medications; they were prescribed by her pain management physician, Dr. Simon.

62. Ms. Overton asked Ms. Rippert to follow up with Dr. Simon for information about the medication.

63. Ms. Overton again voiced concerns about her job status.

64. Ms. Rippert reiterated to Ms. Overton that the department and Human Resources would hold her job as she was as in communication with the Company and following up.

65. However, Ms. Rippert informed Ms. Overton that, per the department, Ms. Overton would not be able to work a modified schedule and that she would have to start over with a new class and be required to work eight (8) hours per day.

66. Ms. Rippert said that it would be fine because the Company would arrange Ms. Overton to work from home, allowing her to get up and stretch as much as she needed.

67. Ms. Rippert informed Ms. Overton that she would need to come into the office for three hours at the beginning to get set up, but that she would work from home from then on.

68. On January 28, 2021, Ms. Overton called Ms. Rippert and left a voice message to provide an update after her appointment with Dr. Frederick the day prior.

69. On February 3, 2021, Ms. Rippert called Ms. Overton to follow up on the message she had left on January 28.

70. It was determined during the doctor visit that Ms. Overton would need orthoscopic surgery, which was scheduled for February 9, 2021.

71. They discussed Dr. Frederick's determination that Ms. Overton would need another surgery.

72. Ms. Rippert said that she thought that she would be able to get Ms. Overton into the most recent class of February 2021, but that it wouldn't work with Ms. Overton's surgery schedule.

73. Ms. Overton told Ms. Rippert that she could push the surgery back until after the completion of the class if needed since she wouldn't have the necessary job modifications.

74. Ms. Rippert replied that Ms. Overton should have the surgery done now because it would look unfavorable if Ms. Overton came back for the class only to have the surgery and take LTD again.

75. Ms. Rippert told Ms. Overton that she could start with the June 2021 class after she completed her surgery.

76. With the multiple assurances that her job status was not in jeopardy, Ms. Overton followed the counsel by Ms. Rippert and went through with the surgery as scheduled.

77. On February 4, 2021, Ms. Rippert called Ms. Overton and said that she was trying to figure out what would happen once Ms. Overton was released from the doctor on March 1, 2021, particularly in regards to how Ms. Overton would be paid since she would no longer be eligible for long term disability.

78. However, Ms. Rippert stated that she still believed that it would be through disability.

79. Ms. Rippert further told Ms. Overton not to worry and to focus on her surgery, and reassured Ms. Overton once again that her job was safe and that the Company would hold her job.

80. On February 23, 2021, Ms. Burt called Ms. Overton and told her that she was being separated from the Company effective January 29, 2021 because she would not have been able to attend the February 2021 class.

81. Ms. Overton inquired as to when the class was to start and Ms. Burt responded that the class started at the "end of January, early February."

82. Ms. Overton stated that this did not seem reasonable given that the Company knew she was having surgery, and how could she attend the class when she was in surgery.

83. Ms. Overton also said that this was contrary to what Ms. Rippert had told Ms. Overton during the phone call on February 3 about the June 2021 class.

84. Ms. Burt replied that the department was not having a class in June and that the next class would be in September 2021.

85. Ms. Burt stated that the Company was trying to accommodate Ms. Overton.

86. Ms. Overton questioned the Company's supposed efforts to accommodate her and her disability given that the Company could have easily accommodated her by putting her in the February class after her surgery and let her catch up since she had already successfully passed the class before to get the position of Customer Service Representative.

87. Ms. Burt simply stated that this was the policy, that she was just the "messenger," and that the Company did not have to hold Ms. Overton's position.

88. Later that day, Ms. Overton called Ms. Burt and asked for a new separation letter.

89. Ms. Burt stated that Ms. Overton could just use the first letter she had received dated October 28, 2020 as the separation letter.

90. Given her treatment during her employment with the Company and the circumstances surrounding her employment and termination, Ms. Overton maintains that she was subjected to discrimination on the basis of her disability and/or perceived disability, and that her termination was a result of discrimination and retaliation for seeking workers' compensation benefits and/or reporting a workplace injury, in violation of state and federal laws.

91. Ms. Overton has suffered mental anguish and severe emotional distress as a direct and proximate result of the actions and inactions of Defendants.

92. Defendants and their agents acted with the intent of causing or with reckless disregard for the probability that their actions would cause Ms. Overton severe emotional distress.

93. Ms. Overton has suffered financial losses, which include, among other things, lost wages and an obligation for attorneys' fees and costs of bringing suit, as a direct and proximate result of the actions and inactions of Defendants.

**COUNT I**
**The Americans with Disabilities Act, 42 U.S.C. § 12101, et seq.**

94. Plaintiff Lynn Overton repeats and incorporates by reference the allegations of all preceding paragraphs as if fully set forth at length herein.

95. Based on the foregoing, Defendants have engaged in unlawful employment practices in violation of the Americans with Disabilities Act.

96. In discriminating against and harassing Ms. Overton on the basis of her disability and/or because Defendants regarded Ms. Dailey as disabled, in denying Ms. Dailey requested accommodations, and in retaliating against Ms. Dailey for seeking reasonable accommodations, Defendants violated the ADA.

97. Said violations were intentional and willful.

98. Said violations warrant the imposition of punitive damages.

99. As the direct and proximate result of Defendants' violation of the Americans with Disabilities Act, Plaintiff Lynn Overton has sustained loss of earnings, severe emotional and psychological distress, loss of self-esteem, loss of future earning power, as well as back pay, front pay, and interest due thereon, and has incurred attorneys' fees and costs.

## COUNT II
### Wrongful Termination

100. Plaintiff Lynn Overton repeats and incorporates by reference the allegations of all previous paragraphs as if fully set forth at length herein.

101. Ms. Overton reported a workplace injury and/or sought workers' compensation benefits.

102. Defendants terminated Ms. Overton in retaliation for reporting a workplace injury, indicating that she intended to seek workers' compensation benefits and/or seeking workers' compensation benefits in violation of Pennsylvania public policy.

103. The above-described conduct of Defendants, in terminating Ms. Overton, represents wrongful termination under the common law of the Commonwealth of Pennsylvania.

104. As the direct and proximate result of Defendants' wrongful termination of Ms. Overton in violation of Pennsylvania law and public policy, Plaintiff has sustained loss of earnings, severe emotional and psychological distress, loss of self-esteem, loss of future earning power, as well as back pay, front pay, and interest due thereon, and has incurred attorneys' fees and costs.

105. Defendants and their agents acted with knowledge of, or in reckless disregard of the probability that their actions and inactions would cause Ms. Overton to suffer emotional distress.

106. Defendants' actions in terminating Ms. Overton were intentional and willful, and warrant the imposition of punitive damages.

### PRAYER FOR RELIEF

107. Plaintiff Lynn Overton repeats and incorporates by reference the allegations of all preceding paragraphs as if fully set forth at length herein.

**WHEREFORE**, Plaintiff Lynn Overton respectfully requests that this Court enter judgment in her favor and against Defendants Exelon Corporation and PECO Energy Company, and Order:

a. Appropriate equitable relief, including reinstatement or front pay;

b. Defendants to compensate Plaintiff with a rate of pay and other benefits and emoluments of employment to which she would have been entitled had she not been subjected to unlawful discrimination, harassment, and wrongful termination;

c. Defendants to compensate Plaintiff with the wages and other benefits and emoluments of employment lost because of Defendants' unlawful conduct;

d. Defendants to pay Plaintiff punitive damages;

e. Defendants to pay Plaintiff compensatory damages for future pecuniary losses, pain and suffering, inconvenience, mental anguish, loss of employment and other nonpecuniary losses as allowable;

f. Defendants to pay Plaintiff's costs of bringing this action, including, but not limited to, Plaintiff's attorneys' fees;

g. Plaintiff be granted any and all other remedies available under the ADA and Pennsylvania common law; and

h. Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff Lynn Overton hereby demands trial by jury as to all issues so triable.

>*/s/ Christopher A. Macey, Jr.*
>Christopher A. Macey, Jr., Esquire
>Bell & Bell LLP
>One Penn Center
>1617 JFK Blvd. – Suite 1254
>Philadelphia, PA 19103
>
>*Attorneys for Plaintiff Lynn Overton*

Dated: November 1, 2021